# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LAVON T. DAVIS )
)
)
        Plaintiff, )
)
v. )        Case No. 16-cv-1764 (GMH)
)
NANCY A. BERRYHILL, )
in her official capacity as )
Acting Commissioner of Social Security )
)
        Defendant. )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Lavon T. Davis ("Plaintiff") brought this action on September 1, 2016, seeking to reverse the final decision of the Commissioner of Social Security, Defendant Nancy A. Berryhill ("Defendant" or "Commissioner"), denying her application for supplemental security income benefits under Title XVI of the Social Security Act. *See* Compl. [Dkt. 1]. Presently ripe for resolution are two motions: (1) Plaintiff's motion for reversal; and (2) Defendant's motion for affirmance of the Commissioner's decision denying Plaintiff's application for benefits. Upon consideration of the parties' briefs and the entire record,[1] the Court will deny Plaintiff's motion and grant Defendant's motion. The Court's rationale follows.

---

[1] The docket entries relevant to this Memorandum Opinion are: (1) Plaintiff's Memorandum in Support of her Motion for Judgment of Reversal ("Pl. Mot.") [Dkt. 14-2]; (2) Defendant's Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt. 15]; (3) Plaintiff's Answer in Opposition to Defendant's Motion for Affirmance ("Pl. Opp.") [Dkt. 19]; and (5) the Administrative Record ("AR") [Dkt. 10]. All citations to page numbers within a particular document will be to the ECF docket page numbers assigned to the document.

## BACKGROUND

### A.      Legal Framework for Social Security Disability Claims

To be eligible for disability benefits under the Social Security Act, a claimant must be found to be "disabled" by the Social Security Administration ("SSA").  42 U.S.C. § 423(a).  In most cases, to determine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claimant using that evidence.  20 C.F.R. § 416.920.

In that evaluation, the ALJ must determine whether: (1) the claimant is presently engaged in substantial gainful activity; (2) the claimant has a medically severe impairment or impairments; (3) the claimant's impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation; (4) the impairment prevents the claimant from performing her past relevant work; and (5) the claimant, in light of her age, education, work experience, and Residual Functional Capacity ("RFC"),[2] can still perform another job that is available in the national economy.  *Id.*  The claimant bears the burden of proof in the first four steps of the evaluation.  *Callahan v. Astrue,* 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, however, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform.  *Id.*

When making this determination, an ALJ may call a vocational expert ("VE") to testify as to whether a claimant can perform other work that exists in the national economy.  *Id.* at 90.  A VE may draw his or her conclusions from a number of sources, including the Dictionary of Occupational Titles ("DOT").  *Id.*  The DOT, last published by the U.S. Department of Labor in 1991,

---

[2] A claimant's RFC is an assessment of the most a claimant is able to do notwithstanding her physical and mental limitations.  *See Butler v. Barnhart*, 353 F.3d 992, 1000 (D.C. Cir. 2004).

provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker. *See generally* DOT, 1991 WL 645964. Along with VE testimony, the SSA generally relies on the DOT to determine if there are jobs in the national economy that a claimant can perform given her age, education, work experience, and RFC. *See* 20 C.F.R. §§ 416.966–416.969. Based on this analysis, if there are no such jobs, the claimant is deemed disabled; if there are, she is deemed not disabled.

### B.    Relevant Facts

#### 1.    *Plaintiff Lavon Davis*

Plaintiff is a 25-year-old woman residing in Washington, D.C. She was born on December 12, 1991 and suffers from hydrocephalus,[3] requiring the placement of a shunt.[4] AR at 566, 618, 746, 766. In addition to hydrocephalus, Plaintiff has been diagnosed with borderline intellectual functioning[5] and affective disorder.[6] *Id.* at 522–23, 958. Despite these impairments, Plaintiff was able to obtain her high school diploma and complete a course in cosmetology, although she has not obtained her cosmetology license. *Id.* at 48, 106, 113.

---

[3] Hydrocephalus is a condition characterized by "the accumulation of too much fluid in the brain." *Health Library – Hydrocephalus in Children*, Johns Hopkins Medicine, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/nervous_system_disorders/hydrocephalus_in_children_22,hydrocephalusinchildren/ (last visited July 12, 2017).

[4] A shunt is the most common treatment for hydrocephalus, and is a "small piece of silicone tubing placed surgically inside the body to bypass a blockage or otherwise create a better flow of cerebrospinal fluid." *Health Library – Hydrocephalus in Children*, Johns Hopkins Medicine, http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/nervous_system_disorders/hydrocephalus_in_children_22,hydrocephalusinchildren/ (last visited July 12, 2017).

[5] Borderline intellectual functioning applies to individuals with an IQ falling between 71 and 84, and who operate on the border between normal intellectual functioning and intellectual disability. *See Swope v. Barnhart*, 436 F.3d 1023, 1024 (8th Cir. 2006) (citations omitted).

[6] The regulations defined affective disorders, which includes depression, as disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." Subpt. P, App. 1, 12.04 (2016). "Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." *Id.*

While Plaintiff attended a general education high school and was enrolled in regular classes, she received special education services in the form of assistance from an extra teacher and modified homework assignments. *Id.* at 45–46. Her Individualized Education Program ("IEP")[7] from while Plaintiff was in high school indicates that when she was in the twelfth grade, she was performing at a 6.3 grade level in basic math calculation and a 3.8 grade level in applied math problems, demonstrating "strength in solving basic addition, subtraction, and multiplication problems with both speed and accuracy." *Id.* at 442. With regard to reading, Plaintiff "demonstrated strength in her ability to spell correctly higher level words, read and create sentences, and de-code words correctly," but needed additional support in reading fluency.[8] *Id.* at 443. Plaintiff's difficulty with reading fluency, which she performed at a 1.6 grade level, reportedly impacted her reading comprehension. *Id.* Plaintiff's overall reading ability, however, was at a 7.5 grade level. *Id.* Moreover, Plaintiff performed at a 5.7 grade level in the category of written expression, demonstrating strength in writing short, simple sentences and generating sentences after given prompts. *Id.* at 444. Plaintiff performed at a 4.4 grade level in grammatical writing, however, and struggled with identifying and using correct punctuation. *Id.* Lastly, Plaintiff's IEP indicates that her social-emotional functioning was adequate, that she expressed emotions appropriately, and that she used appropriate coping skills when dealing with stressors. *Id.* at 445.

In addition to her borderline intellectual functioning, Plaintiff has been diagnosed with depression. *Id.* at 523, 958. Plaintiff saw a psychologist on a weekly basis in high school and has stated that she has difficulties handling stress and getting along with others. *Id.* at 60, 114–15,

---

[7] An IEP is a "written statement for each child with a disability" and includes an explanation of the "child's present levels of academic achievement," the child's "measurable annual goals," and other periodic reports assessing the child's academic performance. 34 C.F.R. § 300.320.

[8] Reading fluency is "the ability to read text accurately and quickly" and is characterized by "the melody in our speech and our ability to express it." Maryanne Wolf, *Common Questions About Fluency*, Scholastic, https://www.scholastic.com/teachers/articles/teaching-content/common-questions-about-fluency/ (last visited July 26, 2017).

445.  Her mother also reported that Plaintiff exhibited depressive symptoms and was difficult to deal with emotionally, saying that she "lays around at home a lot." *Id.* at 114.  In 2010, when Plaintiff saw an evaluating psychologist, the doctor reported that Plaintiff "appeared tired, tense, depressed, sad, [and] reluctant," and noted that Plaintiff's "[a]ffect was flat." *Id*. at 520.  Another doctor reported that her depression is not severe because it does not have any significant impact on her daily functioning based on her lifestyle. *Id.* at 960.

Plaintiff's employment history includes full-time employment in child care during the summers between 2006 and 2009, with part time employment during the school year. *Id.* at 49.  Plaintiff reported that during on-the-job training, she was given instructions on how to complete tasks and did not have any difficulty following directions. *Id.* at 50–51.  In 2010, Plaintiff had a summer job "cleaning up around the neighborhood," but struggled because it required that she be in the heat for prolonged periods of time. *Id.* at 52.  From September 2013 to March 2014, Plaintiff worked full time at a daycare but was terminated from this position in what Plaintiff describes as a "he said, she said" dispute.[9] *Id.* at 97.  In 2014, Plaintiff was working at another daycare five days a week from 5:00 PM to 10:30 PM. *Id.* at 95.  The record suggests that Plaintiff may have had some difficulty preparing lesson plans and obtaining the proper credentials for this job. *Id.* at 466–68, 473.  Plaintiff was terminated from her position as a teacher's aide at the daycare in May 2015 for allegedly abusing some of the children—an allegation that Plaintiff denies. *Id.* at 473.  Presently, Plaintiff lives with her grandparents and enjoys spending time with friends, reading, and watching television. *Id.* at 59, 60, 363, 367.

---

[9] There is no other record evidence describing this dispute apart from Plaintiff's own testimony.

## 2. Plaintiff's Application for Disability Benefits and the ALJ's Decision

On September 22, 2010, when Plaintiff was 18 years old, she applied for supplemental security income under the Social Security Act due to her hydrocephalus. *Id.* at 322–25, 358. Plaintiff alleges that her hydrocephalus diminished her intellectual capacity, and caused physical limitations and debilitating headaches. Pl. Mot. at 3. An ALJ issued a decision denying Plaintiff's claim on November 29, 2012, *see* AR 157–73, but the Social Security Appeals Council remanded the case on January 13, 2014, concluding that the ALJ's initial decision lacked a proper function-by-function analysis related to Plaintiff's mental limitations, did not clarify the degree of limitation in the RFC assessment, and did not contain an RFC that properly reflected the moderate mental limitations assessed by State agency consultants and other medical experts of record. *Id.* at 174–77. On remand, a different ALJ denied Plaintiff's application on March 17, 2015. *Id.* at 14–37. Finding no error, the Appeals Council denied Plaintiff's request for review of this decision, making it the final decision of the Commissioner. *Id.* at 1–6.

## 3. The Administrative Record

In reaching her decision, the second ALJ evaluated Plaintiff's condition based on evidence in the administrative record, including various medical records and State agency consultative examinations, Plaintiff's own testimony, and a VE's testimony. The relevant portions of the administrative record pertaining to Plaintiff's physical and mental impairments are summarized below.

### a. Plaintiff's Medical History

Soon after her birth, Plaintiff developed hydrocephalus and a Dandy-Walker malformation.[10] *Id.* at 611. She underwent surgery for placement of two shunts in her brain in February

---

[10] "Dandy-Walker Syndrome is a congenital brain malformation involving the cerebellum . . . and the fluid-filled spaces around it. . . . An increase in the size and pressure of the fluid spaces surrounding the brain (hydrocephalus) may also be present." *Dandy-Walker Syndrome Information Page*, National Institute of Neurological Disorders and

1992.  *Id.* at 611–23.  The shunts were replaced later that month due to complications, and Plaintiff had a catheter to the abdomen installed.  *Id.* at 617–25.  After the shunt was replaced, subsequent CT scans performed between 1996 and 2001 indicated no evidence of shunt failure, although occasionally Plaintiff reported intermittent headaches.  *Id.* at 815, 831, 840, 854.

After Plaintiff experienced three months of intermittent headaches in 2008, her neurosurgeon, Dr. Robert Keating, conducted a CT scan, which indicated that she needed a shunt replacement.  *Id.* at 578, 597.  Following the 2008 shunt replacement, Plaintiff reported that her headaches improved and occurred less frequently.  *Id.* at 555.  Subsequent CT scans have shown that Plaintiff's shunt is stable.  *Id.* at 536, 551, 556.  In January 2012 Plaintiff again reported headaches but did not complain of headaches in any subsequent examinations that year.  *Id.* at 896, 899–909.  A physician cleared Plaintiff for full participation in school, physical education, and sports in May 2012.  *Id.* at 909.  In 2013, Dr. Keating diagnosed Plaintiff with possible migraine headaches, as opposed to shunt-related headaches, which she treated with Tylenol.  *Id.* at 977–79.  Plaintiff was encouraged to get a follow-up eye exam and endocrine test to determine the cause of the headaches, but, as of the close of the record, she had not done so.  *Id.* at 1001.

### b.      Dr. Sambhu Banik, Ph.D. – Consultative Psychological Evaluation

On November 26, 2010, Dr. Banik, a licensed psychologist, conducted a consultative evaluation of Plaintiff at the request of the Defendant's Disability Determination Division.  *Id.* at 520–21.  Plaintiff reportedly appeared tired, tense, depressed, sad, and reluctant during her evaluation, but was nevertheless responsive and cooperative.  *Id.*  She was articulate, her speech was coherent and relevant, and her attention span was within normal limits.  *Id.*  Plaintiff's grandfather, who

---

Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Dandy-Walker-Syndrome-Information-Page (last visited July 26, 2016).

accompanied her to the evaluation, reported that she had trouble getting along with others, needed to be reminded to maintain her hygiene, and had to be "protected from fights." *Id.* at 521. Plaintiff reported that she started her day at 6:45 AM and left home at 7:15 AM to take the metro to school. *Id.* She stated that she returned home from school at around 3:30 PM and that her grandmother picked her up from the metro, at which point she typically took a nap, watched TV, did her home-work, and talked on the phone with her friends. *Id.* at 522. Plaintiff also reported that she could do many things independently, such as reading, writing, counting, using the phone, taking public transportation, managing money, cooking, cleaning, and washing. *Id.*

Dr. Banik administered a WAIS-IV test,[11] which revealed that Plaintiff has a full scale intelligence score of 71, consistent with borderline intellectual functioning. *Id.* at 522–23. Dr. Banik also diagnosed Plaintiff with depressive disorder, learning disorder by history, and adjust-ment problems related to issues with parental drug and alcohol abuse. *Id.* at 523. Dr. Banik ad-vised Plaintiff to seek psychiatric treatment and medication for her emotional problems. *Id.*

### c.        Dr. Chitra Chari, M.D. – Consultative Physical Examination

Dr. Chari, a neurologist, conducted an evaluation of Plaintiff on January 9, 2011. *Id.* at 524–26. Plaintiff reported that she had ninth grade reading and eighth grade math abilities. *Id.* at 524. She also reported that she could "do everything" that others can do, but that she worked slowly. *Id.* At the evaluation, she was unable to divide dollars by cents, but displayed full strength in all of her extremities, normal sensory perception, and stable and non-progressive neurological dysfunction. *Id.* at 525–26. Dr. Chari also observed that Plaintiff could walk quickly and without assistance. *Id.*

---

[11] The WAIS-IV test is the most widely used IQ test and consists of multiple subtests, including verbal comprehension, perceptual reasoning, and working memory. An individual's scores on these subtests are compiled to calculate their full scale IQ. *U.S. v. Y.A*, 42 F. Supp. 3d 63, 71 (D.D.C. 2013).

#### d. Dr. Norman Kane, Ph.D. – State Agency Medical Consultant

Dr. Kane, a psychologist, reviewed Plaintiff's record in February 2011. *Id.* at 138. Based on his review, Dr. Kane found that Plaintiff's medically determinable impairments include a disorder of the nervous system and affective disorder—i.e., depression. *Id.* Dr. Kane concluded that Plaintiff's affective disorder caused her mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 138. Dr. Kane also determined that she had no limitations with understanding, memory, concentration, or persistence, and a moderate limitation in her ability to interact with the general public. *Id.* at 140–41. In reaching this conclusion, Dr. Kane gave "[g]reat weight" to the opinions of Drs. Chari and Banik. *Id.* at 139.

#### e. Dr. Esther Pinder, M.D. – State Agency Medical Consultant

Dr. Pinder, a physician, reviewed Plaintiff's record in February 2011 and concluded that she is capable of performing a full range of light work. *Id.* at 139–40. Dr. Pinder's physical RFC analysis indicates that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk for a total of six hours, and sit for a total of six hours. *Id.* at 140. Additionally, according to Dr. Pinder, Plaintiff had an unlimited capacity to push and pull. *Id.*

#### f. Dr. Gemma Nachbahr, Ph.D. – State Agency Medical Consultant

Dr. Nachbahr, a psychologist, reviewed Plaintiff's record in June 2011 and affirmed Dr. Kane's conclusion that her depression resulted only in mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 150. Dr. Nachbahr conducted a mental RFC assessment and found that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or in her ability to understand and remember short and simple instructions. *Id.* at

153.  With respect to Plaintiff's ability to maintain attention and concentration for extended periods, Dr. Nachbahr found moderate limitations.  *Id.*  She found no limitations, however, in Plaintiff's ability to perform activities within a schedule, sustain an ordinary routine, work in coordination with others, or make simple work-related decisions.  *Id.* at 154.  Dr. Nachbahr opined that Plaintiff was moderately limited in her ability to respond appropriately to changes at work and to set realistic goals or make plans independently due to her borderline IQ, but found that she had no limitations in her ability to take precautions against normal hazards or travel in unfamiliar places and use public transportation.  *Id.*

### g.  Dr. Jacqueline McMorris, M.D. – State Agency Medical Consultant

Dr. McMorris, a physician, reviewed Plaintiff's record in June 2011.  She opined that Plaintiff could: occasionally lift, carry, or pull twenty pounds; frequently lift, carry, or pull ten pounds; work six hours a day; and sit with normal breaks for about six hours.  *Id.* at 151.  Posturally, Dr. McMorris found that Plaintiff could never climb ladders, ropes, or scaffolds, but had an unlimited ability to climb ramps and stairs, balance, stoop, kneel, or crouch.  *Id.* at 152.  Dr. McMorris further opined that Plaintiff must avoid heights and should avoid exposure to vibrations because of her shunt.  *Id.* at 152–53.  Lastly, Dr. McMorris concluded that Plaintiff must avoid "even moderate exposure" to hazards.  *Id.* at 153.  In reaching these conclusions, Dr. McMorris assigned "[g]reat weight" to the opinions of Drs. Chari and Banik.[12]  *Id.* at 151.

### h.  Dr. Hillel Raclaw, Ph.D. – State Agency Medical Consultant

Dr. Raclaw, a psychologist, assessed Plaintiff's ability to perform work-related mental activities on June 25, 2012.  *Id.* at 956–62.  He found that Plaintiff had mild restrictions in her ability to understand, remember, and carry out simple instructions and her ability to make work-related

---

[12] Dr. Eduardo Haim, a state agency medical consultant, affirmed Dr. McMorris' findings in June 2011.  AR 149.

decisions. *Id.* at 956. According to Dr. Raclaw, Plaintiff also had mild limitations in her ability to interact appropriately with the public and her supervisors and co-workers, and moderate limitations in her ability to respond appropriately to common work situations and changes in a routine work setting. *Id.* at 956–57.

Dr. Raclaw concurred with Dr. Banik's depression diagnosis, but opined that Plaintiff's depression was non-severe because it had a minimal impact on her adaptive functioning and because she was not seeking mental health treatment and was able to modulate her emotions. *Id.* at 958. Dr. Raclaw also noted that Plaintiff is able to shop, handle money, and relate with others, despite her compromised intelligence. *Id.* In sum, according to Dr. Raclaw, Plaintiff's impairments are not disabling, particularly in light of the fact that she completed high school and pursued post-graduate work and because her activities of daily living were intact. *Id.* at 962.

### i.    Plaintiff's Testimony

During the first administrative hearing in this matter, on June 5, 2012, Plaintiff testified as to a number of physical limitations that she experienced due to her hydrocephalus. She explained that she experiences discomfort when exposed to heat, has frequent headaches as a result of her shunt, can only sit in the same position for two hours, can only walk for twenty minutes at a time, has balance problems, experiences fatigue, and needs to nap for about four hours at a time. AR 52, 55, 58. Plaintiff also described problems with her memory, being around other people, obtaining a driver's license, and handling stress. *Id.* at 45, 59–60.

Plaintiff testified again at the third and most recent administrative hearing in this matter[13] on December 18, 2014 following remand from the Appeals Council. *Id.* 88–133. During her

---

[13] The second administrative hearing, which took place on October 31, 2012, was a supplemental hearing held during the first proceeding before remand. During this hearing, only Plaintiff's attorney and a VE were present and the ALJ who decided the case in the first instance was revisiting medical evidence. AR 75.

testimony, Plaintiff explained that she only experiences headaches twice per month due to decreased stress, but that she still feels fatigued and sleeps for about twelve hours every day. *Id.* at 99–103. At the time of her testimony, Plaintiff worked at a daycare, taking care of infants and toddlers. *Id.* at 104.

### j.    Tonie Burks' Testimony

At the post-remand administrative hearing in this matter, Plaintiff's mother, Tonie Burks, testified. Ms. Burks testified that Plaintiff went to nursing school but "wasn't able to keep up." *Id.* at 113. She also noted that it took Plaintiff longer than average to complete cosmetology school and that when she did complete it, she "didn't have enough confidence" to seek certification. *Id.* At the time of Ms. Burks's testimony, Plaintiff was planning to enroll in school to study early childhood education. *Id.* Ms. Burks noted that Plaintiff suffers from depression, and sometimes needs help to make appointments, go to the bank, or mail letters. *Id.* at 114–15. She further testified that she and Plaintiff had lived together "off and on," until 2012. *Id.* at 117–21.

### k.    The VE's Testimony

The ALJ also sought testimony from a VE at the post-remand administrative hearing to determine whether Plaintiff could maintain employment. *Id.* at 127. The VE classified Plaintiff's past experience as a daycare worker as semi-skilled, light work. *Id.* at 128–30. The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work history who could: perform light work; not climb ladders, ropes, or scaffolds; not be exposed to workplace hazards; and not be exposed to excessive noise. *Id.* at 129. The VE testified that such an individual could perform unskilled, light jobs, including work as a daycare worker, router, stock checker, or non-postal mail clerk, all of which existed in significant numbers in the national economy. *Id.*

The ALJ next asked the VE to consider a hypothetical individual with the same limitations as the individual in the previous hypothetical, but further limited the individual to being able to: perform only simple, routine, repetitive tasks in a work environment without fast-paced production requirements; and make only simple work-related decisions with few, if any, workplace changes. *Id.* at 130. The VE noted that someone with these limitations would not be qualified to perform work at a daycare, but could still work as a router, stock checker, or non-postal mail clerk. *Id.* The VE further testified that someone hypothetically off task more than fifteen percent of the time would be unemployable. *Id.* at 130. Plaintiff's representative inquired whether the jobs available for the hypothetical individual would change if the individual needed to miss two days of work per month in order to sleep due to headaches. *Id.* at 131. The VE testified that such a limitation would also preclude all competitive employment. *Id.*

### 4. The ALJ's Decision

Based on the evidence of record and the testimony at the hearing, the ALJ issued a decision on March 17, 2015, finding Plaintiff not disabled under the Social Security Act and thus not entitled to supplemental security income. *Id.* at 32. Running through the five-step sequential analysis, the ALJ first found that Plaintiff was not engaged in substantial gainful activity since September 22, 2010, her disability application date. *Id.* at 19; *see generally* 20 C.F.R. §§ 416.971–416.976. Because Plaintiff alleged disability based on her mental and physical impairments, the ALJ was required to apply the Psychiatric Review Technique, also known as the "special technique," at the second and third steps of her analysis to determine whether Plaintiff had any medically-determinable mental impairments and, if so, whether those impairments met or were equal in severity to the applicable mental disorders listed in the regulations. *See* 20 C.F.R. § 416.920a (2011). Under the "special technique," if the ALJ finds that a claimant's mental impairments neither meet nor are

equivalent in severity to any listing, the ALJ will then proceed to determine the claimant's RFC. *Id.* at § 416.920a(d)(3) (2011).

Following this procedure, the ALJ found that Plaintiff's hydrocephalus with shunt placement and learning disorder were severe impairments, meaning that they had "more than a minimal effect on [her] ability to do basic work activities," but that her depression, which resulted in no "more than minimal limitation in [her] ability to perform basic mental work activities," was not. AR 20. Specifically, with respect to Plaintiff's depression, the ALJ considered the "paragraph B" criteria for evaluating mental disorders in section 12.00C of the Listing of Impairments at step two. *Id.* For reasons discussed in more detail below, the ALJ found that Plaintiff's depression did not satisfy the restrictions required by the "paragraph B" criteria—that is, that it caused no more than mild restrictions in Plaintiff's functioning—and thus concluded that her depression was non-severe. *See infra* pp. 18–23.[14]

Continuing to step three, the ALJ compared Plaintiff's one severe mental impairment—her "learning disorder"—to listing 12.05, which applies to Intellectual Disorders, in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and found that her impairment neither met nor equaled the listing. AR 21. At the time the ALJ rendered her decision, intellectual disability referred to a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," i.e., before the age of twenty-two. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05 (2015). To be found presumptively disabled, a claimant would need to: (1) display a mental incapacity "evidenced by dependence upon others for personal needs (e.g.,

---

[14] In order to satisfy the paragraph B criteria, the ALJ would have had to find two of the four following levels of functional limitations: marked restrictions in activities of daily living; marked restrictions in social functioning; marked restrictions in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 416.925 (2011); *id.* at Pt. 404, Subpt. P, App. 1, 12.00(A)(2)(b) (1985). A "marked" limitation means more than moderate but less than extreme. *See id.* at Subpt. P, App. 1, 12.00(F)(2)(d) (2017).

toileting, eating, dressing, or bathing) and [an] inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded"; (2) receive a "valid verbal, performance, or full scale IQ of 59 or less"; (3) receive a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function"; or (4) receive a "valid verbal, performance, or full scale IQ of 60 through 70," resulting in satisfaction of at least two of the four standard "paragraph B" criteria. *Id.* In considering these criteria, the ALJ found "no indication that [Plaintiff] meets or equals the listing" because she was positive, well-spoken, ambitious, worked at a daycare, planned to go to college, and graduated high school. AR 21. Additionally, though Plaintiff struggled to perform at grade level, the ALJ found that her high school curriculum was not indicative of intellectual disability. *Id.*

Because the ALJ found that Plaintiff's impairments did not meet or medically equal one of the impairments described in the listing, she proceeded to determine Plaintiff's RFC. *Id.* at 22–31. After considering the evidence of record, the ALJ concluded that Plaintiff has the RFC

> to perform light work as defined in 20 C.F.R. 416.967(b) except [Plaintiff] can never climb ladders, ropes or scaffolds. She should avoid exposure to excessive noise, which is noise at level 4 or higher per the Dictionary of Occupational Titles. She should avoid exposure to workplace hazards such as unprotected heights, but she can drive a vehicle. [Plaintiff] is limited to performing simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions.

*Id.* at 22. The ALJ also opined that Plaintiff's hydrocephalus with shunt placement and learning disorder could reasonably cause her alleged physical symptoms, but determined that the symptoms were not as intense, persistent, or limiting as Plaintiff claimed. *Id.* at 28.

After determining Plaintiff's RFC, the ALJ proceeded to the fourth step of the analysis. Here, the ALJ found that Plaintiff did not have any past relevant work because her prior employment as a daycare worker was precluded by her current RFC. *Id.* at 31; *see also id.* at 130 (VE's testimony that a hypothetical individual with Plaintiff's RFC would be precluded from employment as a daycare worker); 20 C.F.R. § 416.960(b)(1). At step five, however, the ALJ determined that Plaintiff had the RFC to perform other work within the national economy, including work as a router, stock checker, and non-postal mail clerk. AR 32. Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act and denied Plaintiff's application for benefits. *Id.*

### 5. *Plaintiff's Complaint in District Court*

Having exhausted her administrative remedies, Plaintiff commenced this action in this Court under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claims for disability benefits. *See* Compl. [Dkt. 1]. She requests that the Court reverse the Commissioner's decision, or, in the alternative, issue an order remanding the case to the Commissioner for a new administrative hearing. Pl. Mot. at 1.

### LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). The court has the authority to reverse or remand the Commissioner's decision if it is not supported by substantial evidence or is not made in accordance with applicable law or regulations. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Simms v. Sullivan,* 877 F.2d 1047, 1047 (D.C. Cir. 1989). The D.C. Circuit has instructed that "[i]f the case is one that involves the taking of additional evidence for any reason, the district court is obligated to obtain an enhancement or revision of the record by way of remand to the [Commissioner]"

rather than outright reversal. *Callahan v. Astrue,* 786 F. Supp. 2d 87, 93 (D.D.C. 2011) (quoting *Ignoia v. Califano*, 568 F.2d 1383, 1389 (D.C. Cir. 1977)).

The plaintiff bears the burden of proving that the Commissioner's decision is not supported by substantial evidence. *Id.*; *see also Brown v. Barnhart*, 408 F. Supp. 2d 28, 31 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (citation and quotation marks omitted). It requires "more than a mere scintilla of evidence, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 2 (D.D.C. 1995).

The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.* Rather, the reviewing court must determine whether the ALJ "has analyzed all evidence and has sufficiently explained that weight he [or she] has given to obviously probative exhibits." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (internal quotation omitted); *see also Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are based on substantial evidence and a correct interpretation of the law).

## DISCUSSION

Plaintiff raises numerous challenges to the ALJ's decision, which the Court will categorize and address in the following order.[15] First, Plaintiff argues that the ALJ erred in finding Plaintiff's

---

[15] To provide structure and clarity to the Court's decision, the undersigned has consolidated Plaintiff's arguments into three categories that capture the gist of Plaintiff's motion.

depression non-severe at step two.  Pl. Mot. at 17.  Second, Plaintiff asserts that the ALJ failed to properly consider the record as a whole with respect to her RFC assessment and credibility findings between steps three and four. *Id.* at 11–12, 17–19.  Finally, Plaintiff alleges that the ALJ's denial of benefits lacks support from substantial evidence of record in a variety of ways.  *Id.* at 10–17. For the reasons that follow, Plaintiff's arguments are without merit.[16]

### A.     The ALJ's Step Two Determination

Plaintiff first appears to argue, in a conclusory fashion, that the ALJ erred at step two when she determined that Plaintiff has no limitations in social functioning and that her depression is non-severe because those determinations were based on the ALJ's "lay judgment."  *Id.* at 12 n.13, 17. As a preliminary matter, the Court notes that any alleged error at step two "does not necessarily require reversal so long as the ALJ considered the omitted impairment(s) in evaluating the remaining steps in the sequential analysis."  *Blackmon v. Astrue*, 719 F. Supp. 2d 80, 91 (D.D.C. 2010); *see also Hicks v. Astrue*, 718 F. Supp. 2d 1, 12 (D.D.C. 2010) (collecting cases); *Burch v. Barnhart*, 400 F.3d 676, 682–83 (9th Cir. 2005) (finding no reversible error at step two when the impairment found to be non-severe would not have satisfied listing requirements at step three and was considered in determining claimant's RFC).  That is to say, an error at step two is harmless so long as the ALJ finds another impairment severe and continues to apply the five step analysis, providing an opportunity for the ALJ to further consider the omitted impairments in evaluating the remaining steps. *Blackmon*, 719 F. Supp. 2d at 91.

This is especially true when, as here, there is no indication in the evidence of record that the impairment found to be non-severe at step two would have satisfied an enumerated listing in the ALJ's subsequent "special technique" analysis.  *Hicks*, 718 F. Supp. 2d at 13; *see also Burch*,

---

[16] To the extent an individual argument is not addressed herein, it should be deemed meritless and denied.

400 F.3d at 682–83.  Indeed, Plaintiff does not argue that her depression would have satisfied the requirements for listing 12.04, which applies to affective disorders, and that she thus was prejudiced by the ALJ's conclusion at step two.  *See* Pl. Mot. at 17; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 (2015).  Plaintiff instead makes a bald allegation that her depression was erroneously found to be non-severe without providing any supporting evidence.  Further, it is clear that the ALJ considered Plaintiff's depression and its symptoms in assessing Plaintiff's RFC.  Aside from explaining at step two that she considered all mental reports in her subsequent analysis, *see* AR 20, the ALJ specifically considered in her RFC assessment the opinions of: Dr. Kane, who first diagnosed Plaintiff with an affective disorder; Dr. Nachbahr, who affirmed Dr. Kane's diagnosis and described the depression's impact on Plaintiff's functional capacity; and Plaintiff herself, who reported that she suffered from an affective disorder and struggled to be around people.  *Id.* at 22–23, 25–26.  Absent some further showing from Plaintiff as to why the ALJ's failure to find her depression severe at step two constitutes reversible error, the Court "need not determine whether the ALJ's finding of non-severity as to Plaintiff's depression . . . was legal error, as any alleged error at step two did not prejudice Plaintiff and therefore does not require reversal."  *Hicks*, 718 F. Supp. 2d at 14; *see also Jeffries v. Astrue*, 723 F. Supp. 2d 185, 191 (D.D.C. 2010).

In any event, the Court finds Plaintiff's arguments against the ALJ's conclusions at step two to be unavailing.  At step two, an ALJ is required to "consider the medical severity" of a claimant's impairments.  20 C.F.R. § 416.920(a)(4)(ii).  If the ALJ determines that a claimant does not "have a severe medically determinable physical or mental impairment," the ALJ will find the claimant not disabled.  *Id.*  To qualify as severe under the regulations, an impairment must "significantly limit[]" a claimant's ability to do basic work activities.  *Id.*[17]  Further, when evaluating

---

[17] Basic work activities include: physical functions like walking, sitting, and standing; the ability to see, hear, and speak; the ability to understand, carry out, and remember simple instructions; use of judgment; the ability to respond

the severity of a *mental* impairment at this step, an ALJ must apply the "special technique" described in 20 C.F.R. § 416.920a. As noted, the "special technique" requires an ALJ to "rate the degree of functional limitation resulting from the impairment" in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* at § 416.920a(b)(3) (2011); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(C) (2015).[18] If an ALJ rates a claimant's degrees of limitation as "none" or "mild," the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe," absent some indication of a more than minimal limitation in the claimant's ability to complete work related activities. *Id.* at § 416.920a(d)(1). Here, the ALJ followed this procedure and found that Plaintiff's depression causes only "mild limitation" in her ability to perform basic work activities because, based on the ALJ's application of the "special technique," the depression was responsible for no limitations other than a mild restriction in Plaintiff's ability to maintain concentration, persistence, or pace. AR 20–21. Despite finding that Plaintiff's depression was not severe, the ALJ noted that she "considered all mental reports," including Dr. Banik's report diagnosing Plaintiff with depression, in assessing Plaintiff's RFC. *Id.* at 20.

With respect to Plaintiff's suggestion that the ALJ erred when she found that Plaintiff's depression causes no social limitations, it appears that Plaintiff's sole contention is that the ALJ failed to reject evidence of record that supported an alternative conclusion. *See* Pl. Mot. at 12 n.13 ("An ALJ may not select only evidence that supports her conclusions."). While true that this Court

---

appropriately to supervision, co-workers, and usual work situations; and the ability to deal with changes in a routine work setting. *See id.* at § 416.922.

[18] Since the ALJ rendered her decision, the requirements of the "special technique" have changed. This Court's decision considers the regulations as they were at the time the ALJ rendered her decision. *See* 66 Fed. Reg. at 58011 ("With respect to claims in which we have made a final decision, and that are pending judicial review in federal court, we expect that the court's review . . . would be made in accordance with the rules in effect at the time of the final decision.").

has previously held, in the context of an ALJ's RFC determination, that an ALJ should "at least minimally discuss a claimant's evidence that contradicts the Commissioner's position" so as to provide the Court with the information needed to "meaningful[ly] review" that decision, *see Lane-Rauth*, 437 F. Supp. at 67 (quoting *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)), the ALJ's decision here does not stymie the undersigned's ability to conduct a thorough review.  Indeed, in finding that Plaintiff's depression causes no limitations in her social functioning, the ALJ highlighted a litany of facts from the record—including the fact that Plaintiff frequently interacted and went out with her friends, attended church weekly, had a boyfriend, and maintained employment— to support her conclusion.  *See* AR 20; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2) (2015) (defining social functioning as the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals").  And while Plaintiff now highlights, at most, one additional fact that she believes might indicate a limitation in social functioning—that she was fired from her position at a daycare over accusations of "child abuse"—she has entirely failed to explain how that alleged incident was caused by, or should alter the ALJ's conclusion with respect to, her depression.  Pl. Mot. at 12 n.13.

Likewise, Plaintiff argues, again in a conclusory fashion, that the ALJ's finding that her depression is non-severe is unsupported by substantial evidence and is thus grounds for remand. *See* Pl. Mot. at 17.[19]  Once again, Plaintiff has failed to point to any material evidence of record supporting her assertion that the ALJ's step two analysis is flawed.  Indeed, it appears that Plaintiff is simply requesting that this Court conduct a *de novo* review of the ALJ's decision and reweigh the evidence to determine whether her depression is severe.  Such a request is inconsistent with

---

[19] Plaintiff also appears to argue that the ALJ committed reversible error when she claimed that "there was only one report of depression" in the record because, as Plaintiff notes, multiple psychologists of record concurred in that diagnosis. Pl. Mot. at 12 n.13.  The Court fails to see how that is reversible error here, where the ALJ recognized the diagnosis and found Plaintiff's depression to be a medically determinable impairment.  *See* AR 20.

this Court's role and is thus denied. *See Guthrie v. Astrue*, 604 F. Supp. 2d 104, 116–17 (D.D.C. 2009) ("This Court is not permitted to re-weigh the significance of the evidence in the record, but rather to determine whether the ALJ's decision is supported by substantial evidence.").  In any event, the Court finds that the ALJ's conclusion that Plaintiff's depression was non-severe is supported by substantial evidence.  *See, e.g.*, AR 28 (the ALJ's opinion noting that Plaintiff was positive and well-spoken during the administrative hearing, motivated, loved her job, and planned to attend college), 49 (Plaintiff's testimony indicating that she worked part-time in childcare), 154 (Dr. Nachbahr's report finding that Plaintiff had some limitations due to depression but was nonetheless mentally capable of performing routine, repetitive tasks), 367 (Plaintiff's grandfather's report indicating the she went to church and Bible classes every week and enjoyed reading, watching television, and connecting with her friends on Facebook), 958 (Dr. Raclaw's report finding Plaintiff's depression to be non-severe).

### B.     The ALJ's RFC Assessment and Credibility Findings

Plaintiff next contends that the ALJ failed to properly consider the record as a whole with respect to her RFC assessment and credibility findings between steps three and four of the five-step sequential analysis, and thus claims that her decision is procedurally flawed.  *See* Pl. Mot. at 11–14, 17–19.  According to Plaintiff, the ALJ did not engage in a proper function-by-function analysis because she failed to address each of the functions outlined in SSR 96–8p and failed to build a logical bridge connecting the evidence of record and her conclusions.  *Id*. at 12–13.  Specifically, Plaintiff argues that the ALJ did not connect medical evidence to an analysis of Plaintiff's ability to stand, walk, read, write, do math, interact appropriately with others, and sustain a competitive work pace without an abnormal number of breaks.  *Id.* at 13–14.  Lastly, Plaintiff alleges

that the ALJ failed to properly explain her decision to discredit certain parts of Plaintiff's testimony regarding her limitations. *Id.* at 17–20. The undersigned disagrees.

In reaching an RFC determination, an ALJ must identify a claimant's functional limitations and "assess his or her work-related abilities on a function-by-function basis," considering the "credibility" of claimant's symptoms, and the weight assigned to medical opinions of record. *See generally* SSR 96–8p, 1996 WL 374184, at *1; *see also* SSR 16–3p, 2016 WL 1119029, at *12 (defining "credibility" as the consideration of "the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record"). SSR 96–8p further provides that, with regard to the function-by-function analysis, "[t]he RFC assessment must address both the remaining exertional and nonexertional capacities of the individual." 1996 WL 374184, at *5. Exertional capacity addresses an individual's restrictions of physical strength, including an individual's ability to sit, stand, walk, lift, carry, push, and pull. *Id.* Nonexertional capacity considers an individual's ability to perform the following work-related functions: postural activities like stooping and climbing; manipulative activities like reaching and handling; visual activities; communicative activities; and mental activities. *Id.* at *6. With respect to mental activities, competitive work generally requires the ability to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting. *Id.*

In determining that Plaintiff is capable of light, unskilled work, the ALJ gave an extensive and thoughtful analysis to all evidence of record, including Plaintiff's allegations of dizziness, her history of special educational assistance in school, her need for extra time to complete cosmetology school, her need to sleep, and her difficulty managing stress, focusing, and remembering. AR 22. Furthermore, the ALJ discussed the weight she gave to medical opinions, and the opinions that

received the most weight were unanimous in their assessment of Plaintiff's ability to perform light, unskilled work. *Id.* at 25–29. Lastly, the ALJ conducted a thorough analysis of Plaintiff's compromised cognitive abilities, considering Plaintiff's prior work in a daycare center, her motivation to apply to colleges, and her ability to obtain a high school diploma and complete a post-graduate course in cosmetology. *Id.* at 28. Such evidence was considered in light of Plaintiff's well-recognized intellectual limitations and contributed to the ALJ's RFC determination that Plaintiff was nonetheless capable of light, unskilled work. *See id.* at 30.

Moreover, and contrary to Plaintiff's assertion, the ALJ's failure to complete a function-by-function analysis directly connecting medical evidence to Plaintiff's ability to stand, walk, read, write, do math, interact appropriately with others, and sustain a competitive work pace without an abnormal number of breaks is not reversible error. Pl. Mot. at 13–14. The ALJ provided a thorough narrative discussion of the evidence of record regarding Plaintiff's abilities to perform relevant work-related functions in areas in which Plaintiff alleged limitation. AR 25–30. That discussion is sufficient for the ALJ to fulfill her obligation to complete a function-by-function analysis that allows the undersigned to conduct a meaningful review, and Plaintiff's attempts to raise the specter of impropriety on the part of the ALJ without pointing to any actual medical evidence demonstrating that the RFC assessment failed to sufficiently capture Plaintiff's functional limitations or that Plaintiff was incapable of performing the work for which she was ultimately found qualified are thus unsuccessful. *See Clark v. Astrue*, 826 F. Supp. 2d 13, 22–23 (D.D.C. 2011) (finding function-by-function assessment sufficient where there is no medical evidence contradicting the challenged portion of the claimant's RFC); *Cobb v. Astrue*, 770 F. Supp. 2d 165, 171–72 (D.D.C. 2011) (finding reversible error where, among other things, the RFC assessment "impede[d] effective judicial review"); *Banks v. Astrue*, 537 F. Supp. 2d 75, 84–85 (D.D.C. 2008)

(finding specific articulation of all functional demands unnecessary where "the ALJ provided a thorough narrative discussion of [claimant's] limitations" that set out claimant's ability to perform sustained work activities on a regular basis).

Additionally, while Plaintiff argues that the ALJ committed reversible error by failing to include a limitation in the RFC that accounts for Plaintiff's mild limitation in concentration, persistence, or pace, *see* Pl. Mot. at 13–14 (citing AR 20, 22), the undersigned disagrees. As another member of this Court has explained, limiting a claimant to "simple, routine, and repetitive tasks," as the ALJ did here, will not sufficiently capture a claimant's *moderate* limitations in concertation, persistence, or pace, because the latter is a measure of a claimant's ability to stay on task and not their ability to perform tasks. *See Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016). On the other hand, this error is generally considered harmless if the medical evidence establishes that the claimant is capable of completing simple, routine tasks despite moderate limitations in concentration, persistence, or pace, and if the claimant is limited to unskilled work. *See id.* (citing *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014)). In light of this exception, the undersigned finds that the following three factors weigh against Plaintiff's argument for remand: (1) the ALJ determined that Plaintiff had only mild—as opposed to moderate—difficulties maintaining concentration, persistence, and pace; (2) the ALJ identified substantial medical and other evidence of record—including her completion of cosmetology school and high school and the opinions of Drs. Haim, McMorris, and Nachbahr—establishing that Plaintiff is capable of performing "simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple, work-related decisions"; and (3) all the jobs identified by the VE as appro-

priate for Plaintiff require unskilled work. *See* AR 128–30. As such, the ALJ's failure to specifi-

cally account for Plaintiff's limitations with regard to concentration, persistence, or pace is, at

most, harmless error.

Plaintiff also contends the ALJ improperly discredited Plaintiff's testimony in her RFC

determination. Pl. Mot. at 18–19. A properly reasoned RFC should include a "credibility" dis-

cussion—that is, a consideration of the claimant's statements regarding the intensity and persis-

tence of her symptoms—explaining which of the claimant's symptoms the ALJ found inconsistent

with the evidence and how the ALJ's evaluation of the claimant's symptoms led to that conclusion.

SSR 16–3p, 2016 WL 1119029, at *2–8. A credibility determination is "solely within the realm

of the ALJ" and a "reviewing court will only intercede where an ALJ fails to articulate a rational

explanation for his or her finding." *Grant v. Astrue,* 857 F. Supp. 2d 146, 156 (D.D.C. 2012). To

be sure, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement" that the

claimant is not credible; rather, the determination "must contain specific reasons for the finding

on credibility, supported by the evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight." SSR 96–7P, 1996 WL 374186, at *2.

Here, the ALJ's credibility analysis had a rational basis supported by the ALJ's consider-

ation of the record evidence, and the evidence the ALJ cited in support of her credibility determi-

nation is appropriate and consistent with the medical opinions of record. AR 28. Specifically, the

ALJ reasoned that Plaintiff's positive attitude, motivation to succeed, prior work at a daycare cen-

ter, completion of high school, and reports of fewer headaches were all examples of reasons why

Plaintiff was capable of light, unskilled work despite her testimony that her symptoms had more

limiting effects. *Id*; *see* SSR 96-7P, 1996 WL 374186, at *3 (instructing ALJs to look at, among

other things, "[t]he individual's daily activities" to assess credibility). Because the ALJ clearly and articulately analyzed the record in making her RFC determination and assessing Plaintiff's credibility, the ALJ has met her requirement to provide "specific reasons for [her] finding on cred-ibility, supported by the evidence in the case record" and an assessment that is "sufficiently spe-cific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Porter v. Colvin*, 951 F. Supp. 2d at 134–35 (quoting SSR 96–7, 1996 WL 374186, at *2); *see also Grant v. Astrue*, 857 F. Supp. 2d 146, 156–57 (D.D.C. 2012) ("The Court acknowledges that demeanor is an acceptable basis on which to form a credibility determination, and that an ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." (in-ternal quotation marks and citation omitted)).

### C.     The ALJ's Evaluation of the Evidence of Record

Plaintiff lastly raises a cavalcade of arguments in support of her contention that the ALJ's decision here is not supported by substantial evidence. Pl. Mot. at 10–17. Specifically, Plaintiff asserts that the ALJ improperly weighed the evidence, *id.* at 11–12, 15, improperly omitted mate-rial evidence, *id.* at 10–11, 17, and misrepresented material evidence. *Id.* at 13, 16. Had the evi-dence been properly weighed and considered, Plaintiff argues, the ALJ would have been compelled to find Plaintiff disabled. *Id.* at 19. Based on a review of the ALJ's decision and the evidence of record, the undersigned finds Plaintiff's arguments to be without merit and concludes that the ALJ's denial of disability benefits is supported by substantial evidence—that is, it is supported by more than a mere scintilla of evidence. *Fla. Mun. Power Agency*, 315 F.3d at 365–66.

1.    *The ALJ Properly Weighed the Evidence*

Plaintiff first contends that the ALJ impermissibly awarded weight to medical opinions based on whether such opinions were consistent with the ALJ's own conclusion rather than considering the opinions in light of the record as a whole. *Id.* at 11–12. When determining whether a disability benefits applicant is disabled, an ALJ is required to evaluate every medical opinion they receive. 20 C.F.R. § 416.927(c). Part of that evaluation requires an ALJ to determine which, if any, medical opinion carries more weight than the other opinions of record based on a number of factors. *Id.* Where a treating physician's opinion is proffered as evidence and is consistent with the record as a whole, for example, it is presumptively controlling. *Id.* No such presumption exists here because the record below does not contain a treating source opinion. Instead, it contains two medical opinions based off single consultations (i.e., Drs. Banik and Chari), and six from State agency consultants based off substantive reviews of Plaintiff's medical records (i.e., Drs. Kane, Pinder, Haim, McMorris, Nachbahr, and Raclaw). Thus, no individual examiner had a "great familiarity with [Plaintiff's] condition" occasioned by a long-term treating relationship. *Butler*, 353 F.3d at 1003; *see also Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir, 1993). Rather, the ALJ in this case was free to assess and weigh the medical opinions based on, among other factors, their supportability and consistency with the record as a whole. 20 C.F.R. § 416.927(c). Importantly, where, as here, there is no treating source opinion in the record, the ALJ "must explain in [her] decision the weight given to the opinions of a State agency medical or psychological consultant." *Little v. Colvin*, 997 F. Supp. 2d 45, 55 (D.D.C. 2013). After all, despite coming from non-examining sources, the findings of State agency medical and psychological consultants represent "expert opinion evidence." SSR 96–6p, 1996 WL 374180, at *1.

In her motion, Plaintiff takes specific aim at the ALJ's treatment of the medical opinions of record with respect to the RFC finding, arguing that the ALJ "awarded greater weight to exhibits on the grounds that they agreed with her own conclusions." Pl. Mot. at 11. This is not the case. The ALJ's explanation that she weighed the medical opinions of Drs. Haim, McMorris, Nachbahr, and Raclaw more heavily because she found that their opinions were generally "consistent with a longitudinal review of the credible evidence of record," AR 29–30, is entirely permissible under the regulations, which provide, in pertinent part, that "the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 416.927(c)(4). Further, the ALJ provided reasons for the weight she assigned their opinions and explained how conflicting findings informed her RFC assessment, as she was obligated to do. AR 29–30. For example, in giving "great weight" to the findings of Drs. Haim, McMorris, and Nachbahr, the ALJ explained that she found that their opinions regarding Plaintiff's ability to perform "routine, repetitive tasks at a light exertional level" were "consistent with the record and the claimant's own testimony," including her medical and educational history, her testimony that she enjoyed her work at a daycare center, and her testimony that her headaches were improving and she intended to apply to college. *Id.* at 28–29.

Similarly, the ALJ explained that she gave "significant weight" to the opinions of Drs. Kane and Pinder "to the extent they are consistent with the findings in this decision," *id.* at 29, in accordance with the regulations. *See* C.F.R. § 416.927(c)(4) (providing for more weight where an opinion is consistent with the record as a whole). Indeed, throughout her opinion, the ALJ provided reasons for why Plaintiff may be "slightly more limited than originally opined by Dr. Kane and Dr. Pinder." AR 29. For example, the ALJ noted that the evidence supports additional postural, environmental, and mental limitations not contained in their opinions, including: an inability

to climb ladders, ropes, and scaffolds; a need to avoid concentrated exposure to vibrations; and learning difficulties associated with her mental functioning. *Id.* at 29, 30.

Moreover, Plaintiff's reliance on *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), does not alter this Court's analysis. Pl. Mot. at 12. In the section of *Mascio* cited by Plaintiff, the Fourth Circuit held that the ALJ erred by first determining a claimant's functional capacity and then assessing the credibility of that claimant's allegations of functional limitations due to pain by comparing those allegations to the ALJ's already-formed RFC assessment. 780 F.3d at 639. Instead, the court instructed, an ALJ must determine the credibility of a claimant's allegations of functional limitations due to pain by comparing those allegations to the other evidence in the record, and then consider those allegations, to the extent appropriate, in the RFC analysis. *Id.* Despite characterizing the Fourth Circuit's language in *Mascio* as "[d]ifferent phrasing, same error," nowhere does Plaintiff assert that the ALJ improperly assessed the credibility of her own allegations of pain by comparing those allegations to her already-formed RFC. Pl. Mot. at 11–12. Rather, Plaintiff cites *Mascio* to argue that the ALJ improperly weighed the medical opinion of Dr. Raclaw by stating that it is "consistent with a longitudinal review of the credible evidence of record" and also "supports the residual functional capacity reached in this decision." *Id.* (citing AR 30).[20] But even if the Fourth Circuit's decision in *Mascio* were applicable here, the Court finds that the ALJ carefully reviewed the findings of Drs. Raclaw and Chari in light of all other available medical opinions, and then determined that they deserved great weight because they are consistent with a longitudinal

---

[20] In full, Plaintiff argues that "the ALJ repeatedly awarded greater weight to exhibits on the grounds that they agreed with her own conclusions. The most obvious example is her declaration that she found Dr. Raclaw's opinion entitled to great weight because it was: 'consistent with the longitudinal review of the credible evidence of record. Moreover, this opinion supports the residual functional capacity reached in this decision.'" Pl. Mot. at 11 (citing AR 30). Plaintiff also challenges the ALJ's decision to give great weight to three other opinions—one from Dr. Chari, one from Plaintiff's mother, and one from Plaintiff's grandfather—because they are "consistent with a longitudinal review of the credible evidence of record[.]" *Id.* at 12 (citing AR 30).

review of the record. AR at 24–27, 30. The quote Plaintiff pulls from the ALJ's opinion is misrepresentative of her ten-page RFC analysis and the thoroughness of her review. *See* AR 22–31. Indeed, the ALJ's brief suggestion that she assigned great weight to certain opinions because they "support the residual functional capacity" or are consistent with a "longitudinal review of the credible evidence of record," did not leave this Court guessing as to which portions of the opinions of Drs. Raclaw and Chari the ALJ found to be consistent with the record or how she reached that conclusion. Therefore, Plaintiff's contention that the ALJ improperly weighed the evidence is not reversible error.

To be sure, while the ALJ properly explained the weight given to the opinions of State agency consultants, she did not adequately explain her reasoning for rejecting Dr. Banik's borderline intellectual functioning diagnosis. AR 30. Indeed, the ALJ gave great weight to the opinions of non-examining State agency consultants, asserting that they are consistent with the record as a whole, but Dr. Banik's evaluation was similarly consistent. In fact, two other State agency consultants—Drs. Kane and McMorris, both of whom provided opinions that received great weight from the ALJ—concurred with Dr. Banik's findings and gave his opinion great weight in their own assessments. *Id.* at 139, 149. Because these State agency doctors were relying on Dr. Banik's evaluation of Plaintiff when forming their opinions, it strikes the Court as inconsistent for the ALJ to accord more weight to their opinions based on their consistency with the record, while simultaneously finding that Dr. Banik's opinion, which was based on an actual examination of Plaintiff, is inconsistent. *Id.* at 29–30; *see* 20 C.F.R. § 416.927(c)(1) (explaining that more weight should generally be given to the medical opinion of an examining source than to the medical opinion of a non-examining source).

When explaining the reasons for assigning Dr. Banik's borderline intellectual functioning diagnosis "partial weight," the ALJ referred to reasons "previously discussed," referencing her conclusion that the record does not support a finding of borderline intellectual functioning based on Plaintiff's youth and demeanor, high school curriculum and graduation, college preparation, cosmetology training, and "long-term work experience." AR 28–30. Finding these accomplishments inconsistent with borderline intellectual functioning, the ALJ determined that Plaintiff's mental impairments are instead attributable to a "learning disorder" and "cognitive residuals from her hydrocephalus." *Id.* at 30. While Dr. Banik also diagnosed Plaintiff with a learning disorder in his report, the only conceivable "learning disorder" he references, to the extent it can be characterized as such, is borderline intellectual functioning. *See* AR 520–23. Numerous opinions in the record concur with this borderline intellectual functioning diagnosis, as well. *Id.* at 138, 149, 522–23, 958. The ALJ thus appears to have construed Dr. Banik's "learning disability" diagnosis to reflect a temporary impairment while ignoring his findings that she suffers from borderline intellectual functioning. Indeed, the ALJ specifically explains that she does "not believe the record and claimant's testimony supports *ongoing* borderline intellectual functioning, but recognize[s] that the claimant *had* a learning disorder . . . ." *Id.* at 30 (emphasis added). Borderline intellectual functioning, however, is a lifelong impairment, *see Shaw v. Astrue*, 2009 WL 857283, at *5 (S.D. Ala. March 27, 2009) (collecting cases), which the ALJ failed to appreciate when finding no support for Plaintiff's "ongoing" borderline intellectual functioning. *Id.* Evidence of its ongoing nature, however, can be found in Plaintiff's IEP records, which reflect that she had to drop out of college after one semester and had difficulty finishing cosmetology school. *See id.* at 42–43, 106, 113. Accordingly, it appears that the ALJ improperly "substitute[d] [her] own judgment for com-

petent medical opinion," ignoring multiple borderline intellectual functioning diagnoses to conclude that Plaintiff simply "had a learning disorder" based on Dr. Banik's report. *See, e.g.*, *Balsamo v. Charter*, 142 F.3d 75, 81 (2d Cir. 1998) (citing *McBrayer v. Secretary of Health & Human Servs.* 712 F.2d 795, 799 (2d Cir. 1983)).

Despite this error, the ALJ's decision to give only "partial weight" to Dr. Banik's conclusion does not amount to reversible error. To begin, an opinion provided by a non-treating medical consultant after a single examination, like Dr. Banik's opinion here, is not entitled to any presumption of weight and thus can more easily be given limited weight. *Johnson v. Colvin*, 197 F. Supp. 3d 60, 74 (D.D.C. 2016) (citing *Mastroni v. Bowen*, 646 F. Supp. 1032, 1036 (D.D.C. 1986) ("[L]imited weight should be given to the report of a consulting physician who only briefly examines [the] plaintiff on a single occasion")). Moreover, any error stemming from the weight an ALJ gives to a medical examiner's opinion is generally harmless where the limitations identified by the examiner are consistent with the limitations in the ALJ's RFC determination. *See Covington v. Colvin*, 678 F. App'x 660, 666–67 (10th Cir. 2017) (any error in ALJ's weighing of medical opinions was harmless where ALJ included limitations in the RFC similar to those identified in the opinions); *see also Thompson v. Colvin*, 551 F. App'x 944, 948 (10th Cir. 2014) ("If the ALJ's RFC is generally consistent with the findings in a medical opinion . . ., then there is no reason to believe that a further analysis or weighing of the opinion could advance the claimant's claim of disability." (internal quotation marks and citation omitted)); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1165–66 (10th Cir. 2010) (finding ALJ's failure to specify weight given to examiner's opinion and failure to consider other examining source opinion harmless where limitations in the ALJ's RFC were consistent with those examining source opinions). After all, "the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than

the mere diagnosis of the disease or name of the impairment." *McKean v. Colvin*, 150 F. Supp. 3d 406, 417 (M.D. Pa. 2015).

Here, despite giving partial weight to Dr. Banik's diagnosis, the ALJ's RFC determination is consistent with the overall mental limitations he described. Setting aside the ALJ's misclassification of Plaintiff's mental impairment as a "learning disorder," the ALJ took notice of Plaintiff's depressive symptoms, learning and processing difficulties, and "cognitive residuals from her hydrocephalus," and properly considered the accompanying limitations by restricting Plaintiff to "light work," and "simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions." *Id.* at 22–30. The opinions provided by every single evaluating doctor and State agency consultant of record support this conclusion, finding Plaintiff capable of light, unskilled work despite the limitations caused by her borderline intellectual functioning. *See id.* at 138–40, 146–54, 520–23, 524, 956–62. Furthermore, the ALJ explained why she accorded greater weight to some of the record opinions rather than others, as discussed above, and carefully considered the record evidence in reaching this conclusion. *Id.* at 29–30. Her detailed discussion of the record and explanation for how she incorporated the findings of the respective doctors indicates her ultimate conclusion is supported by substantial evidence and is not inconsistent with Dr. Banik's report. *Id.* at 22–30. Accordingly, no harm results from the ALJ's error and remand is thus unnecessary.[21]

Based on the above, the Court finds that the ALJ properly considered the record as a whole and discussed which evidence she found credible and why. Moreover, she explained the relevance

---

[21] Plaintiff also contends that the ALJ did not give proper consideration to the VE's testimony that an individual similar to Plaintiff who is off task ten to twenty percent of the time is unemployable when she determined that Plaintiff is capable of light and unskilled work. Pl. Mot. at 11; AR 67, 82, 130. This argument, too, is unpersuasive. Plaintiff points to no evidence of record to support this additional limitation to Plaintiff's RFC, and her argument thus falls short of warranting a remand.

of the different medical opinions and provided a rational basis for how she arrived at Plaintiff's

RFC.  Accordingly, Plaintiff's call for remand on these grounds is denied.

2. *The ALJ Did Not Omit Material Information*

a. **The ALJ Considered All Evidence Regarding Plaintiff's Intellectual Functioning**

Plaintiff also contends that the ALJ failed to consider the full range of Plaintiff's intellec-

tual functioning in her RFC.  Specifically, Plaintiff believes that the culmination of the evidence,

including her IEP reflecting below-grade level performance, *id.* at 443, her testimony that she is

only able to perform simple math with a calculator, *id.* at 47, Dr. Chari's finding that Plaintiff

could not divide dollar amounts by quarters, *id.* at 525, and her borderline intellectual functioning

all demonstrate that she is unable to read at 95–120 words per minute as required by the DOT to

maintain employment.  Pl. Mot. at 10.  The undersigned disagrees.

In determining that Plaintiff has the RFC for "simple, routine, and repetitive tasks, in a

work environment free of fast-paced production requirements, involving only simple, work-related

decisions," the ALJ properly considered the record as a whole, making note of Plaintiff's IEP,

which indicated that she performed below grade-level academically, as well as her enrollment in

upper level courses and college preparation efforts.  *Id.* at 22–28.  The ALJ additionally assessed

Plaintiff's intellectual capacity, considering Plaintiff's graduation from high school, completion of

post-graduate work in cosmetology, and prior work at a daycare center, among other things, when

evaluating her intellectual capacity.  *Id.* at 22.  And while Plaintiff's reading speed is not included

in the record evidence, there is no reason to conclude, based on the record here, that she cannot

satisfy the DOT's reading requirements.  Accordingly, the undersigned cannot say that the ALJ

erred in assessing Plaintiff's mental RFC with respect to this argument.

Moreover, Plaintiff's emphasis on isolated reading, writing, and math scores in Plaintiff's IEP are not consistent with the record as a whole. For example, while Plaintiff emphasizes her first-grade reading fluency, the record indicates that Plaintiff enjoys reading as a hobby, *id.* at 59, 367, told Dr. Chari that she could read at a ninth-grade level, *id.* at 524, and had high scores in spelling, reading vocabulary, and letter-word identification. *Id.* at 443. Similarly, Plaintiff's argument that her inability to divide dollars by quarters, as suggested by Dr. Chari, is countered by Plaintiff's own admission that she could add and subtract and her IEP report, which indicates that she can perform math calculations at a sixth-grade level. *Id.* at 47, 442. This additional evidence, omitted from Plaintiff's briefing, lends credence to the ALJ's RFC determinations and indicates that her decision is supported by substantial evidence. Remand for reconsideration would thus be a futile gesture.

### b. The ALJ Considered All Evidence Regarding Plaintiff's Limitations

Plaintiff next argues that the ALJ omitted material evidence regarding the functional and environmental limitations associated with Plaintiff's impairments—including her headaches, heat intolerance, and the need to avoid concentrated vibrations—when assessing Plaintiff's RFC and posing hypothetical questions to the VE. Pl. Mot. at 7. Again, the undersigned disagrees.

To begin, if a physical impairment such as a headache can be controlled through medication and treatment, it is generally not considered disabling. *See Banks*, 537 F. Supp. 2d at 79 (ALJ's failure to discuss claimant's hypertension was harmless because it "is sufficiently controlled through treatment and medication, [and thus] cannot be considered disabling") (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)). Here, Plaintiff has suffered from headaches for several years, and has successfully treated them with Tylenol and sleep. *See, e.g.*, AR 536. Moreover, and contrary to Plaintiff's allegation, the ALJ discussed Plaintiff's history of headaches at

length, and noted that her headaches had improved after a shunt replacement in 2008. *Id.* at 22–24, 536, 578–79. During the months following the shunt replacement up until March 2009, Plaintiff's headaches improved and were relieved by Tylenol. *Id.* at 536. By April 2010, Plaintiff stated that she had headaches only two to three times per week, which could be relieved by taking Motrin or sleeping. *Id.* At that time, Plaintiff was not prescribed medication for her headaches and her physician noted she was otherwise healthy. *Id.* at 536–37. More recently, in 2013 Plaintiff was again experiencing headaches, *id.* at 977, but they were relieved with Tylenol and there were no signs of shunt failure. *Id.* at 999, 1032. Plaintiff further admitted that her headaches improved with decreased stress. *Id.* at 28, 99–100. Plaintiff's medical history thus provides no basis to conclude that her intermittent headaches present a reason to alter the ALJ's RFC determination.

Additionally, Plaintiff contends that the ALJ improperly ignored the recommendation of the VE that someone who hypothetically needs to miss two days per month of work due to headaches in order to sleep would be unemployable. Pl. Mot. at 7; AR 131. This contention is without merit. The ALJ took into consideration the fact that Plaintiff's headaches occurred approximately twice per month, generally lasted only about one hour, and, importantly, were successfully treated with over-the-counter medication. AR 28, 102. In light of this evidence, the record does not support a finding, as Plaintiff contends, that Plaintiff is required to miss work twice per month simply because sleeping is an alternative means of treating her intermittent headaches.

Plaintiff next argues that the ALJ committed reversible error by failing to include in Plaintiff's RFC her other environmental limitations—namely, her heat intolerance and her need to avoid concentrated vibrations. Pl. Mot. at 7. This argument is again without merit. To begin, the ALJ accorded "great weight" to the opinion of State agency consultant Dr. McMorris, who noted that Plaintiff should avoid exposure to vibrations because of her shunt and must avoid even "moderate

exposure" to hazards.  AR 29, 152–53.  In summarizing Dr. McMorris's recommendations, the ALJ specifically observed that Plaintiff has the ability to "perform light work," with certain additional limitations, including an inability to climb ladders, ropes, and scaffolds, and a need to avoid concentrated exposure to vibrations.  *Id.* at 22, 29.  While true that the ALJ did not specifically include Plaintiff's self-reported heat intolerance, *see id.* at 374, 380,[22] or Dr. McMorris' recommendation that Plaintiff avoid concentrated exposure to vibrations, *id.* at 152, in her RFC, the ALJ's failure to put a temperature or vibration limitation in her RFC assessment is harmless error. An error is harmless "when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  A review of the Dictionary of Occupational Titles' descriptions of the three jobs for which the ALJ and the VE determined Plaintiff is qualified—router, stock checker, and non-postal mail clerk—establishes that none of them call for any exposure to temperature extremes or vibrations.  *See* DOT 222.587-038 (G.P.O.), 1991 WL 672123 (Router); DOT 299.667-014 (G.P.O.), 1991 WL 672642 (Stock Checker); DOT 209.687-026 (G.P.O.), 1991 WL 671813 (Mail Clerk).  Thus, even if the ALJ had incorporated temperature and vibration limitations into her RFC assessment, Plaintiff's RFC would have still permitted her to work in those three positions.  As such, to the extent that the ALJ's failure to include them in her RFC assessment was error, that error does not call for remand. *See Mellgren v. Colvin*, 2015 WL 5021725, at \*5–6 (E.D. Wash. Aug 24, 2015) (finding no prej-

---

[22] For evidence of her heat intolerance, Plaintiff draws the Court's attention to her own disability report form, in which she indicates that she becomes nauseated and light-headed when in the heat.  Pl. Mot. at 7 (citing AR 374).  Plaintiff points to no other instance in the record, however, where she expressed a heat intolerance or where a medical examiner determined that Plaintiff should avoid temperature extremes.  *Id.*

udice where ALJ omitted humidity and temperature limitations in an RFC where the job that Plaintiff was ultimately found qualified for did not involve exposure to humidity or extreme temperatures).

Based on the above, the Court finds that the ALJ properly considered all material evidence of record, including all examining and reviewing medical opinions and Plaintiff's subjective complaints regarding her physical limitations, and her finding that Plaintiff is not disabled is thus supported by substantial evidence.

### 3. The ALJ Did Not Misstate Material Evidence

Plaintiff also contends that the ALJ misstated several pieces of material evidence, incorrectly suggesting that Plaintiff was able to drive, did not use medication to treat her headaches, took British Literature and other advanced courses in high school, and was able to complete college-level courses. Pl. Mot. at 13, 16. Material evidence, however, must have a tendency to contradict an ALJ's conclusion and alter a case's outcome. *Jeffries v. Astrue*, 723 F. Supp. 2d 185, 195 (D.D.C. 2010). Contrary to Plaintiff's assertion, the outcome below did not hinge on any of the ALJ's purported misstatements.

First, the ALJ's statement that Plaintiff can "drive a vehicle," even if corrected, has no bearing on Plaintiff's RFC to perform light, unskilled work, especially considering that Plaintiff has no trouble taking public transportation by herself. *See* AR 22, 154. Second, Plaintiff contends that the ALJ erred when stating that she does not take medication, explaining that "[Plaintiff] and her grandfather both stated that she took ibuprofen and Tylenol." Pl. Mot. at 13. While Plaintiff has testified that she occasionally takes over-the-counter medication to help alleviate her symptoms, there is no evidence in the record to establish that Plaintiff was prescribed stronger medica-

tion.  In any event, even if the ALJ overlooked the fact that Plaintiff took over-the-counter medi-

cation for her headaches, Plaintiff has failed to demonstrate how that fact would impact the ALJ's

conclusion that she can perform light, unskilled work.  In fact, it stands to reason that ibuprofen

and Tylenol would help treat Plaintiff's intermittent headaches, lending support to the conclusion

that she is capable of working despite any pain caused by that impairment.

Third, Plaintiff believes that the ALJ mischaracterized the evidence regarding Plaintiff's

high school coursework.  Specifically, Plaintiff alleges that the ALJ did not properly consider her

IEP indicating below-grade level performance and argues that the ALJ's finding that Plaintiff was

"capable of high school level work" is "unsupported by substantial evidence."  Pl. Mot. at 16.  The

undersigned disagrees.  Not only did Plaintiff herself testify that she graduated from high school

on time and obtained the same degree as the rest of her classmates, AR 46, but any misapprehen-

sion of Plaintiff's high school curriculum on the part of the ALJ is immaterial in light of the ALJ's

conclusion, consistent with the medical evidence of record, that Plaintiff is limited to performing

"simple, routine, and repetitive tasks, in a work environment free of fast-paced production require-

ments, involving only simple, work-related decisions."  AR 22.

Lastly, Plaintiff alleges that the ALJ mischaracterized Plaintiff's "educational aspirations"

as evidence that she was "capable of college work."  Pl. Mot. at 16.  This, again, is not material

evidence.  The ALJ did not contend in her final determination that Plaintiff was capable of skilled,

college-level work, but, rather, of "light, unskilled work" only.  AR 32.  Whether Plaintiff was

capable of attending college would not alter the outcome below because, as discussed previously,

the ALJ conducted a thorough review of the medical evidence, determining that she suffered from

reduced intellectual capacity and was thus limited to performing "simple, routine, and repetitive

tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions." *See id.* at 22.

## CONCLUSION

Plaintiff has raised a full range of challenges to the ALJ's decision, many of which were underdeveloped, addressed only by footnote, raised in a few sentences unaccompanied by any relevant citation, or different iterations of the same argument—that the ALJ failed to properly articulate her consideration of the record evidence, for example. *See, e.g.*, Pl. Mot. at 11–12. The undersigned has consolidated Plaintiff's scattershot arguments into three distinct claims and considered them in turn, finding each to be without merit. The ALJ provided more than sufficient explanation to support her conclusions and credibility assessments, satisfying her requirement to provide "more than a mere scintilla" of supporting evidence. *Fla. Mun. Power Agency*, 315 F.3d at 365–66. Accordingly, the undersigned will not remand this matter, as doing so would be to replace the ALJ's clearly explained judgments with his own.

For the foregoing reasons, Plaintiff's motion for judgment of reversal will be **DENIED** and Defendant's motion for judgment of affirmance will be **GRANTED**. An appropriate Order will accompany this Memorandum Opinion.


Date: August 7, 2017                                   _____
                                                       G. MICHAEL HARVEY
                                                       UNITED STATES MAGISTRATE JUDGE